# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| U.S. Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>v.<br><br>Scott M. Ross, Maize Capital Management LLC, and Maize Asset Management, LLC,<br><br>Defendants. | No. 09 C 5443<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff U.S. Commodity Futures Trading Commission (the "CFTC" or the "Commission") brings this action against Defendant Scott M. Ross and his companies, Maize Capital Management, LLC and Maize Asset Management, LLC (collectively "Defendants"). The CFTC seeks a supplemental order assessing restitution and a civil monetary penalty pursuant to Section 6c of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2006) (the "Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII, § 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and the Regulations promulgated thereunder, 17 C.F.R §§ 1.1 *et seq.* (2009).

## I. Procedural History

The CFTC filed its original complaint against Defendants on September 4, 2009 (the "Complaint"). The Complaint alleged that Defendants violated numerous sections of the Act and sought a permanent injunction, civil penalties, and other injunctive and equitable relief. This matter was terminated when a Consent Order of Permanent Injunction and for Other Statutory and Equitable Relief (the "Consent Order") was entered against Defendants on June 23, 2010.

1

In the Consent Order, parties reserved the issue of determining appropriate restitution and monetary sanction and established that, in connection with this determination, the allegations of the Complaint and the findings and conclusions in the Consent Order shall be accepted as true and deemed true by the Court. This matter was reopened on January 8, 2014, for the limited purpose of imposing appropriate monetary penalties.

## II. Background

All of these facts originate from either the Complaint or the Consent Order and are therefore undisputed. From early 2007 through February 2009, Scott M. Ross operated several companies that purportedly invested in securities and engaged in currency trading. These companies conducted currency trading through a commodity pool (the "Fund") that was established in 2008.

In order to solicit participants, Defendants presented a fraudulent "pitchbook" and issued confidential private placement memorandum ("CPPM") that contained materially false and misleading statements regarding how the Fund would be administered. For example, Defendants misrepresented the percentage of customer funds that would be placed at risk at any one time. Additionally, although the Fund's prospectus claimed that its purpose was to "seek capital appreciation through commodities trading of foreign exchange, energy, precious metals and interest rate products," trading in the Fund focused exclusively on currency trading. Defendants then exacerbated the fraudulent solicitations by sending out materially false and misleading account statements that represented realized gains in forex trading, but omitted unrealized losses from those account statements. Defendants solicited approximately 93 participants for the Fund who invested $6,962,395.07.

The United States Securities and Exchange Commission ("SEC") filed a complaint against Ross on February 3, 2009, that sought to enjoin him from violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. This Court entered an order freezing the assets of Ross and, among other entities, Maize Asset, Maize Capital, and the Fund. *See SEC v. Ross*, Civil Action No. 09-683 (N.D. Ill.). This Court further appointed Philip Stern as Receiver (the "Receiver") for Ross and all his assets, including Defendants, and the Fund. The Receiver secured total cash funds in the approximate amount of $2.7 million, including approximately $1,035,628 that was in the Fund at the time of his appointment. These funds were distributed to victims as a percentage share of their assets, based upon the investor's net contributions. Net contributions for all investors totaled approximately $11,756,366. The Receiver collected and distributed to 325 individuals a total of $2,651,522.01, after accounting for fees and expenses. Because Fund investors received a total of $1,559,576.18 from the distribution, total losses to Fund investors were $5,402,818.89.

On November 2, 2010, the United States Attorney Office for the Northern District of Illinois filed a criminal information against Ross. The United States charged Ross with fraud in connection with two of his investment scams, the Elucido fund and the Moondoggie fund, in violation of 18 U.S.C. § 1341. Pursuant to a plea agreement, Ross was sentenced to a prison term of 72 months, and ordered to pay restitution in the amount of $3,699,834.45 to the victims of those frauds. There was no provision in Ross's criminal settlement for restitution to victims of the Fund fraud.

### III. Discussion

In this matter, the CFTC seeks entry of a restitution order for the benefit of the victims of the Fund as well as a civil monetary penalty.

**A.     Restitution**

It is well established that equitable remedies such as restitution are available to remedy violations of the Act. *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 193 (4th Cir. 2002); *United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760 (6th Cir. 1999). Congress later codified this sentiment when it passed the Dodd-Frank Act of 2010. *See* Section 6c(d)(3) of the Act, 7 U.S.C. § 13a-1(d)(3) ("the court may impose, on a proper showing . . . (A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses) . . . ."). [1]

Here, there is no question that Defendants violated the Act and proximately caused customer losses. After using a fraudulent pitchbook to solicit customers and issuing CPPM that contained materially false and misleading statements, their fraudulent solicitations by sending out materially false and misleading account statements. These material misstatements and omissions were pervasive because all participants in the Fund were required to sign the CPPM.

Where there are material omissions in the context of a fraudulent scheme, the Court can presume the reliance of the Fund's participants. *See Affiliated Ute Citizens v. United* States, 406 U.S. 128, 131 (1972); *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 485 (S.D. Fla. 1996); *see also Fed. Trade Comm'n v. Figgie, Int'l Inc.,* 994 F.2d 595, 605 (9th Cir. 1993) (actual reliance for restitution under section 13 of the FTC Act presumed where the FTC proved defendant made material misrepresentations, that the misrepresentations were widely disseminated, and that consumers purchased defendant's product).

---

[1] As the CFTC points out, both parties mistakenly cited to 7 U.S.C. § 13a-1(d)(3) in their briefs even though this new provision had not yet been passed when the Defendants were perpetrating their fraud. This error, however, can be ignored because excluding this new provision of the Act would not have had any effect on either party's position or the court's equitable power to award monetary sanctions in cases such as this one.

Defendants argue that restitution in this case cannot be measured by customer losses because the Eleventh Circuit has determined that "an award of restitution under § 13a-1 measured in the amount of customer losses is generally improper." *CFTC v. Wilshire Investment Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008) (citing *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 76-79 (3d Cir. 1993)). Unfortunately for Defendants, however, this argument fails because the issue discussed in *Wilshire* does not apply to this case. In *Wilshire*, the Eleventh Circuit addressed a decision made by the Southern District of Florida where the "evidence presented at trial was not sufficient to find that the wrongdoing was so systematic and pervasive . . . that every customer was harmed by fraudulent solicitation." *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 407 F. Supp. 2d 1304, 1314 (S.D. Fla.) *judgment entered*, 407 F. Supp. 2d 1316 (S.D. Fla. 2005).

Unlike the fraud in *Wilshire*, the fraudulent acts in this case were, by their nature, a part of every transaction relating to the Fund. Every dollar in the Fund was both obtained and retained through fraud. Defendants argue that they were not unjustly enriched because they eventually lost the fraudulently obtained money in the currency market.[2] The acceptance of this argument, however, would lead to absurd results. After duping investors into trusting them with millions of dollars, Defendants cannot now hide behind their trading losses and claim sanctuary.

Because some of the money has already been returned, the amount of restitution must be calculated as the difference between what Defendants obtained and the amount customers have already received back. *See, e.g., CFTC v. Marquis Fin. Mgmt. Systems, Inc.*, 2005 WL 3752232,

---

[2] In Defendants' Response, Defendants claim that "Ross gained nothing from the Maize experience except permanent injunctive relief against future trading" and then argue that "since Ross made no money from and was not otherwise unjustly enriched by the Maize episode, there is no basis for a restitution award against him." Defs'. Resp. at 7 (D.E. #21).

at *6 (E.D. Mich. 2005) (calculating restitution in the amount of net customer deposits). As described above, this amount as it relates to the Fund is $5,402,818.89.

**B.      Civil Monetary Penalty**

Section 6c(d)(1) of the Act provides that "the Commission may seek and the Court shall have jurisdiction to impose . . . on any person found in the action to have committed any violation, a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. §13a-1(d)(1) (2006). For the period at issue, the inflation-adjusted statutory civil monetary penalty was $130,000 per violation. *See* 17 C.F.R. § 143.8. The CFTC has set forth several factors to consider in assessing a civil monetary penalty. These factors include: the relationship of the violation at issue to the regulatory purposes of the Act and whether or not the violations involved core provisions of the Act; whether scienter was involved; the consequences flowing from the violations; financial benefits to a defendant; and harm to customers or the market. *In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), *aff'd* 137 F.3d 1300 (11th Cir. 1998).

This case warrants the imposition of a civil monetary penalty because Defendants violated core provisions of the Act and these violations severely harmed the Fund's customers. Specifically, Defendants violated Sections 4b(a)(1)(A) – (C), 4b(a)(2)(A) – (C), 4*o*(1)(A) and (B), 4m, and Regulations 4.20 and 4.30. A penalty of $130,000 for each substantive provision violated is appropriate here; this yields a total civil penalty of $1,300,000.00.

## IV. Conclusion

Because of the pervasive nature of the fraud, and the enormous losses suffered by the victims, I enter the proposed monetary judgment against Defendants, jointly and severally, for restitution of $5,402,818.89 and a civil penalty of $1,300,000.00.

ENTER:

*James B. Zagel*
United States District Judge

DATE: November 26, 2014